28

WALTER WILHELM LAW GROUP
a Professional Corporation
Riley C. Walter #91839
Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
205 E. River Park Circle, Suite 410
Fresno, CA 93720
Telephone:   (559) 435-9800
Facsimile:   (559) 435-9868
E-mail:   rileywalter@w2lg.com

(SPACE BELOW FOR FILING STAMP ONLY)

Attorneys for Plaintiff Tulare Local Healthcare District

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

In re

TULARE LOCAL HEALTHCARE
DISTRICT, dba TULARE REGIONAL
MEDICAL CENTER,

          Debtor.

Tax ID #:   94-6002897
Address:    869 N. Cherry Street
            Tulare, CA 93274

CASE NO.  17-13797

Chapter 9

---

TULARE LOCAL HEALTHCARE DISTRICT,
dba TULARE REGIONAL MEDICAL
CENTER,

          Plaintiff,

vs.

HEALTHCARE CONGLOMERATE
ASSOCIATES, LLC, a California limited
liability company,

          Defendant.

ADV PROC. NO. 18-01005

DC No.:  WW-1

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY
JUDGMENT ON SIXTH CLAIM FOR
DECLARATORY JUDGMENT**

Date:      August 15, 2018
Time:      1:30 p.m.
Place:     2500 Tulare Street
           Fresno, CA 93721
           Courtroom 13
Judge:     Honorable René Lastreto II

///

## Table of Contents

I.   SUMMARY OF ARGUMENT ............................................................1

II.  BACKGROUND FACTS AND PROCEDURAL HISTORY.......................................2

   A.    The Parties to this Adversary Proceeding..........................................2

      1.   The District ...................................................................2

      2.   Healthcare Conglomerate Associates, LLC .......................................3

   B.    The Management Contract With HCCA and Events Leading to the the District's Filing of its Chapter 9 Petition ..............................................................3

      1.   The Petition to Recall Former District Board Member Kumar and the November 2016 Election of Two New Board Members ...........................................4

      2.   The Formation of Another Benzeevi Company, Tulare Asset Management, LLC ......................................................................................5

      3.   The July 2017 Recall Election and HCCA's Efforts to Prevent     the New Duly Elected Board Member from Serving on the Board ....................................5

      4.   HCCA Expedites Its Efforts to Obtain Loans Despite the Board's Decision to Rescind Resolution No. 852 at the July 27 Special Meeting ......................................9

      5.   HCCA Directs the $3,000,000 in Loan Proceeds from the Sale of District Assets to be Wired To The Bank Account of Benzeevi's Company, Tulare Asset Management ...................................................................................10

      6.   HCCA Sued The District in Los Angeles Superior Court And    Notified the District That It Deemed Itself "Insecure" ....................................................11

      7.   The District Filed Its Chapter 9 Petition to Save the Hospital ...........................12

      8.   The District Learns of the Deed of Trust and HCCA Refuses To    Reconvey the Deed of Trust and The District Files This    Adversary Proceeding .................13

III.     FACTS MATERIAL TO THIS MOTION ...............................................................13

IV.    ARGUMENT ................................................................14

    A.    This Court Has Jurisdiction and Is Authorized To Issue a Declaratory Judgment That The Deed of Trust Is Void and of No Force or Effect..........................14

    B.    The Legal Standard for Granting Summary Judgment ......................................15

    C.    The District Has Established That The Deed of Trust Is Void Because Benzeevi Was Not Authorized To Execute The Deed of Trust ......................................................16

        1.    The District's Bylaws Provide that Officers of the District Must Be    Members of the Board and the President of the Board Is The Only    Officer Authorized To Execute Conveyances and Instruments ..........................................................17

        2.    Benzeevi Was Not The Chief Executive Officer of the District or    Authorized By Any Writing To Execute The Deed of Trust As The    District's Agent ......................18

V.    CONCLUSION ..................................................................23

Memorandum of Points and Authorities In Support of Motion

ii

M:\S-U\TRMC\PLEADINGS\Adversary Proceedings\TRMC v. HCCA Ad Proc 18-01005\WW-1 Motion for Declaratory Judgment\brief.final.070218.kdd.docx

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 US 242, 247-248, 106 S. Ct 2505, 2509-2510 (1986)..........................................................................................................20

*Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 760 (9th Cir. 2008) (same)............................................................................................20

*Celotex Corp., v. Catrett*, 477 US 317, 322, 106 S. Ct. 2548, 2522 (1986)...................19

*Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992) (same) ....................20

*Hanon, supra*, 976 F.2d at 500 ......................................................................................20

*In Re McGrath,* 2008 WL 859152 (Bankr. E.D. Cal. 2008) ...........................................26

*Lujan v. National Wildlife Federation*, 497 US 871, 888, 110 S. Ct. 3177, 3188 (1990).20

*Marinovich v. Sanders (In re Marinovich)*, 2007 Bankr. LEXIS 4137 *17-18 (D. Ariz. Bankr. 2007).......................................................................................................21

*United States v. AMC Entertainment, Inc.*, 232 F. Supp.2d 1092, 1107-1108 (C.D. Cal. 2002), *appeal denied*, 245 F. Supp.2d 1094 (C.D. Cal. 2003) ....................................20

**Statutes**

§ 2898..............................................................................................................................21

§ 2947 *et seq*....................................................................................................................21

1334..................................................................................................................................19

*27 Cal. Jur. 3d Deeds of Trust* [*18] §§ 4, 28.................................................................21

27 Cal. Jur. 3d, supra, § 33.............................................................................................21

28 U.S.C. § 1409 .............................................................................................................19

28 U.S.C. § 157(b)(2)(A), (F), (K) and (O) ......................................................................19

28 U.S.C. § 157(d ............................................................................................................19

28 U.S.C. § 157(d) ...........................................................................................................19

28 U.S.C. § 2201 .............................................................................................................19

Cal. Civ. Code § 2875 (special liens)........................................................................19, 21

CAL. CIV. CODE §§ 1091, 2922.......................................................................................21

Cal. Civ. Proc. Code §§ 725a, 726 .................................................................21

Cal. Commercial Code § 9108(c).................................................................27

Cal. Commercial Code § 9504(2). ..........................................................26, 27

Cal. Commercial Code sec. § 9108 ...........................................................26

California Civil Code § 1091 .......................................................................21

Debtor and Plaintiff Tulare Local Healthcare District (the "District" or "Plaintiff") respectfully submits this memorandum in support of its motion for partial summary judgment on its sixth claim for a declaratory judgment in the First Amended Complaint ("Complaint") filed in the above-captioned adversary proceeding. The District requests that the Court issue a declaratory judgment that a deed of trust that purports to create a lien for the benefit of defendant Healthcare Conglomerate Associates, LLC ("HCCA" or "Defendant") on certain of the District's real property is void and of no force or effect.

## I.     SUMMARY OF ARGUMENT

This Court should enter a judgment declaring that a deed of trust encumbering certain of the District's real property is void and of no force or effect. The District is entitled to that judicial determination because the deed of trust does not meet the requirements for validity under California law. Specifically, Yorai Benzeevi, M.D. ("Benzeevi"), who is the manager and owner of HCCA (the company that formerly managed the Hospital operated by the District), was not authorized to execute the deed of trust in the capacity of "Chief Executive Officer" of the District or in any other capacity. California law guards against unauthorized grants and conveyances of real property by imposing requirements for the validity of instruments, and those requirements were not met in this case.

The District's Bylaws also guard against the unauthorized act of executing instruments and conveyances by expressly stating that only the President of the Board of Directors of the District can execute, as President, conveyances and other instruments in writing as the Board of Directors shall authorize or direct the President to sign. These safeguards exist to prevent the exact situation now faced by the District - the unauthorized execution of a deed of trust that encumbers the District's property. For the reasons set forth below, the District respectfully requests that Court protect the public and the District's property by issuing a judgment declaring that the deed of trust is

void and of no force or effect as requested in the District's sixth claim for a declaratory judgment in the Complaint.

## II.     BACKGROUND FACTS AND PROCEDURAL HISTORY

The facts set forth in this section provide the background facts leading to HCCA's scheme to make itself a secured creditor in the District's chapter 9 case carried out by and through its owner and manager, Yorai Benzeevi, M.D. ("Benzeevi"), not long after Benzeevi absconded with $3,000,000 of loan proceeds from the sale of the District's personal property assets. Given Benzeevi's knowledge that the District was in dire financial straits and likely headed into bankruptcy, Benzeevi executed a deed of trust conveying title to the District's real property to a third party, Chicago Title Company, to be held in trust for the benefit of Benzeevi's company, HCCA, just three days before the District was forced to file for chapter 9 bankruptcy protection on an emergency basis because the District was out of cash and had to stave off HCCA's threatened shut down of the District's hospital.

### A.     The Parties to this Adversary Proceeding

#### 1.     The District

The District is a public local healthcare district organized under the Local Hospital District Law set forth in California's Health and Safety Code. It is governed by a Board of Directors (the "Board") consisting of five elected or appointed persons residing in specific electoral zones of the District. Pursuant to the Tulare Local Healthcare District Bylaws (the "Bylaws"), the officers of the District must be members of the Board and are elected by the Board members.[1]

---

[1] *See*, Bylaws appended as Exhibit A to the Request for Judicial Notice ("RJN"), at Article IV, Section 1 which provides as follows: " The officers of the District shall be members of the Board of Directors and elected by the Board members. The officers of the District shall include a President, Vice-President, Secretary and Treasurer. The President, Vice-President, Secretary and Treasurer and such other officers as may be designated by the Board of Directors shall be elected by the Board of Directors at the first regular meeting following an even numbered election year, and as further described herein Article III, Sec. 4 of the Bylaws."

1    The District operates a general acute care hospital facility located at 869 N.
2  Cherry Street in Tulare, California (the "Hospital"), clinics, a laboratory, a fitness facility
3  (called Evolutions Fitness), and other patient services programs. The District serves the
4  needs of about 80,000 residents of the City of Tulare and the surrounding rural
5  communities, including Woodville, Tipton, Pixley and Waukena. It is bisected by State
6  Route 99, a heavily traveled freeway, and many tens of thousands of travelers
7  potentially require emergency medical care each day due to accidents or illnesses in
8  transit through the District's geographical boundaries.

9              2.    **Healthcare Conglomerate Associates, LLC**

10    Healthcare Conglomerate Associates, LLC is a limited liability company
11  organized in December 2013 under the laws of the State of California. HCCA was
12  organized by Bruce Greene, an attorney with the law firm of BakerHostetler LLP
13  ("BakerHostetler").[2] Benzeevi, a Visalia resident, is the manager and/or member of
14  HCCA and its Chief Executive Officer[3]. The District believes that Allan W. Germany
15  ("Germany") was and/or is HCCA's Chief Financial Officer and Chief Operating Officer.

16    **B.    The Management Contract With HCCA and Events Leading to the**
17        **the District's Filing of its Chapter 9 Petition**

18    On May 29, 2014, HCCA and the District entered into a contract involving four
19  agreements consisting of a Management Services Agreement ("MSA"), Interim Joint
20  Operating Agreement, Joint Operating Agreement and Option (collectively, the
21  "Contract").[4] Pursuant to the MSA, HCCA was retained as the manager of the Hospital[5]
22  and other medical facilities through which the District provides services in Tulare
23  County. Over time, the relationship between the District and HCCA deteriorated as
24
25  _____
26  [2] RJN, Ex. B.
    [3] RJN, Ex. C
27  [4] Copies of the documents that comprised the Contract were filed in the District's Chapter 9 case as Dkt.
    Nos. 37, 38, 39 and 40, respectively, and as Exhibit 2 to the Declaration of Yorai Benzeevi filed on
    October 17, 2017 (Dkt. 89).
28  [5] The MSA defines the term "Hospital" as an acute care hospital at 869 North Cherry Street in Tulare,
    California.

Memorandum of Points and Authorities In Support of Motion    -3-    M:\S-U\TRMC\PLEADINGS\Adversary
Proceedings\TRMC v. HCCA Ad Proc 18-01005\WW-
1 Motion for Declaratory
Judgment\brief.final.070218.kdd.docx

1  questions and issues surfaced concerning HCCA's performance of its obligations under

2  the Contract, including financial mismanagement and other improprieties.[6]

3              **1.    The Petition to Recall Former District Board Member Kumar**

4                  **and the November 2016 Election of Two New Board Members**

5          In or around September 2016, citizens of the District began collecting signatures

6  for a petition to recall Board member Parmod Kumar ("Kumar").  Kumar had served on

7  the Board since in or around 1994.  The petition to recall Kumar was filed in or around

8  late September 2016.  Kumar was perceived to be a close ally and staunch supporter of

9  Benzeevi and HCCA.  The proponents of the recall petition were dissatisfied with

10  Kumar's vote to hire HCCA as manager of the Hospital and Kumar's oversight of the

11  use of $85 million in general obligation bond proceeds[7] approved by voters in 2005 (the

12  "Bond Proceeds").

13          In November 2016, the District conducted an election for two seats on the Board.

14  At that time, Kevin Northcraft ("Northcraft") and Michael Jamaica ("Jamaica") were

15  elected to serve on the Board.  Northcraft and Jamaica ran on a campaign platform

16  insisting on transparency, accountability and close scrutiny of HCCA's management of

17  the Hospital.  HCCA, Benzeevi and Germany perceived that the campaign platform and

18  subsequent election of Northcraft and Jamaica to be adverse to their economic interests

19  under the Contract.  HCCA, Benzeevi and Germany also believed that if the District's

20  voters recalled Kumar, a majority of the District's new Board would insist on

21

22

23  [6] These questions and issues include, but are not limited to: (a) failing to provide financial and other
24  information requested by members of the District's Board; (b) concerns expressed by EideBailey, the
    District's independent auditor, respecting HCCA's lack of financial and internal controls set forth in the
    District's audit for the fiscal year ending June 30, 2016; (c) machinations to prevent the seating of duly
25  elected Board member Senovia Gutierrez; (d) providing inaccurate and/or incomplete information to the
    District's Board respecting the District's financial health; (e) taking actions in contravention of the best
26  interests of the District and its residents; and (f) transfers and/or loans of the District's assets to Southern
    Inyo Hospital, which was also managed by HCCA at that time.  Southern Inyo filed for chapter 9
27  protection and an Order approving termination of HCCA's management agreement was entered in
    December 2017. *In re Southern Inyo Healthcare District*, Case No. 2016-10015, Dkt 382.
28  [7] The Joint Legislative Audit Committee, at the request of State Senator Jean Fuller (R-Bakersfield),
    recently unanimously voted to audit the use and expenditure of the Bond Proceeds.

transparency, accountability and closer scrutiny of HCCA's management of the Hospital and related patient service programs.

### 2. The Formation of Another Benzeevi Company, Tulare Asset Management, LLC

A few weeks after the petition to recall Kumar was filed and just prior to the November 2016 election, Bruce Greene of BakerHostetler executed Articles of Organization of a limited liability company named Tulare Asset Management, LLC ("Tulare Asset Management"). Tulare Asset Management's Articles of Organization were filed on October 31, 2016 in the office of the Secretary of State of the State of California as document number 201630910116.[8] The business address of Tulare Asset Management listed in such Articles of Organization is a residence on Lakewood Drive in Visalia, California, which is believed to be Benzeevi's residence. Thus, it appears that Benzeevi conducted the business of Tulare Asset Management from his residence located within this judicial district.

### 3. The July 2017 Recall Election and HCCA's Efforts to Prevent the New Duly Elected Board Member from Serving on the Board

After the November 2016 election, the District's Board consisted of Kumar, Jamaica, Northcraft, Linda Wilbourn ("Wilbourn"), and Richard Torrez ("Torrez"). Wilbourn served as President of the Board. Kumar, Wilbourn and Torrez were perceived to be close allies and supporters of Benzeevi and HCCA. The petition to recall Kumar was successful and an election was scheduled to take place on July 11, 2017 as set forth in Board Resolution No. 852 dated April 10, 2017.[9]

A few weeks before the July 11, 2017 recall election, HCCA convened a special meeting of the District's Board and proposed that HCCA be authorized to borrow up to $22 million to fund operational expenses (including costs relating to the Tower Project,

---

[8] RJN at Ex. D.
[9] RJN at Ex. E.

1　repayment of indebtedness, and for other Hospital purposes). A special board meeting

2　was held on June 20 to consider HCCA's request, and the Board voted 3-2[10] to approve

3　the request. The resolution approving that motion was given the duplicate number of

4　Resolution No. 852 ("Resolution No. 852").[11]

5　　　　A special election was held on July 11, 2017, and the District's voters recalled

6　Kumar with roughly 81% of the votes cast in favor of recall. In that same special

7　election, Senovia Gutierrez ("Gutierrez") was elected to replace Kumar by winning

8　roughly 76% of the votes cast. On July 20, the Tulare County Elections Office certified

9　the results of the July 11 special election.[12] Notwithstanding the overwhelming

10　percentage of votes in favor of his recall, Kumar requested that a recount take place but

11　then failed to timely deliver payment for the recount on the day it was scheduled to take

12　place. A recount eventually did take place which confirmed the fact that Kumar was

13　recalled by a landslide.

14　　　　On July 25, 2017, Gutierrez took the Oath of Office to serve as a member of the

15　District's Board.[13] On or about July 26, Michael Allan, an attorney representing Kumar,

16　sent a letter to the District's Board asserting that the Board would commit a violation of

17　the Ralph M. Brown Act ("Brown Act") if the Board recognized Gutierrez as a Board

18　member and demanded that the Board cease and desist from recognizing her.

19　　　　On July 26, 2017, at the Board's regularly scheduled meeting, Wilbourn, acting in

20　her capacity as the Board's President and in contravention of the will of the voters of the

21　District, refused to recognize Gutierrez as a Board member. Wilbourn relied on the

22　opinion of HCCA's counsel, Bruce Greene of BakerHostetler who, at that time, was also

23　counsel for the District, to justify her refusal to recognize Gutierrez as a Board member.

24　Wilbourn took this position notwithstanding the fact that (a) the Tulare County Elections

25　Office had certified the result of the special election on July 20, 2017; (b) such

26

---

[10]Northcraft and Jamaica voted against the proposed resolution.

27　[11] Exhibit F to RJN.
　　[12] Exhibit G to RJN.

28　[13] Declaration of Kevin Northcraft ("Northcraft Decl.") at p. 6, lns. 2-4; Dkt No. 104 on the docket in this Chapter 9 case.

certification was made available to the Board; and (c) Gutierrez had taken the oath of office on July 25.  Wilbourn then unilaterally canceled the July 26 Board meeting.  Notwithstanding Wilbourn's decision to unilaterally cancel the July 26 Board meeting, Board members Northcraft, Jamaica and Gutierrez conducted a meeting and scheduled a special meeting to be held on July 27, 2017.  Late in the evening of July 26, Bruce Greene, acting as counsel for HCCA and the District, stated that the District would not recognize any action taken at the July 27 Board meeting.[14]

On July 27, 2017, the District conducted a special Board meeting.  At that July 27 special Board meeting, the Board approved the following motions to, among other things: (a) rescind Resolution No. 844 pursuant to which HCCA had the authority to engage legal counsel; (b) rescind Resolution No. 851 and Resolution No. 852 regarding HCCA's authority to seek loans; (c) terminate BakerHostetler as counsel for the District; (d) retain the law firm of McCormick Barstow as counsel for the District; and (e) schedule a special meeting to be held on August 9, 2017.[15]  Board members Wilbourn and Torrez did not attend that meeting.

Late in the evening on July 28, 2017, in an email sent to Northcraft, Bruce Greene stated that, acting in his capacity as counsel for the Board, it was his opinion that the special meeting held on July 27 was invalid and that Gutierrez was not a member of the Board.[16] Mr. Greene's email further asserted that Northcraft, Gutierrez and Jamaica were "risking personal liability" for conducting such Board meetings and that "there will be no insurance coverage or indemnification rights under the District's Bylaws" in the event of litigation.  On Sunday, July 30, 2017, Greene reiterated these positions in another email to Northcraft.[17]

On August 9, 2017, the District conducted a special meeting of the District's Board.  At the August 9 special meeting, the Board approved the following motions to,

---

[14] Ex. 15 to Dkt. 106 (Ex. 15 Northcraft Decl.).
[15] Ex. 16 to Dkt. 106 (Ex. 16 to Northcraft Decl.).
[16] Ex. 17 to Dkt. 106 (Ex. 17 to Northcraft Decl.).
[17] Ex. 19 to Dkt. 106 (Ex. 19 to Northcraft Decl.).

among other things: (a) declare the July 11, 2017 recall election results; (b) appoint

certain Board members as officers; and (c) remove all Hospital board officers. Board

members Wilbourn and Torrez did not attend that meeting.[18]

In addition, on August 9, 2017, Marshall Grossman, an attorney with the law firm

of Orrick, Herrington & Sutcliffe ("Orrick"), transmitted a letter to District Board members

Northcraft, Jamaica and Gutierrez on behalf of his clients, Benzeevi and HCCA.[19]  In the

August 9 letter, Orrick asserted, *inter alia*, that the District Board meetings were "falsely

billed" as official District Board meetings. Orrick demanded, among other things, that

Northcraft, Jamaica and Gutierrez "cease and desist" from conducting the Board

meetings "given the potential for litigation to which you may be a party."

On August 23, 2017, a regular meeting of the Board was scheduled to take

place.  That very same day, Wilbourn chose to transmit a letter to Bruce Greene

resigning from her position as the Board member of Zone 5 of the District as of noon

that day.  In an email to Northcraft transmitted late in the afternoon of August 23,

Greene stated that Wilbourn and Torrez were not available to attend the Board meeting

and it would be canceled.  Despite HCCA's efforts to stop the Board from conducting a

meeting, the Board met on August 23 to conduct the District's business.[20]

On August 24, 2017, the McCormick law firm, acting as counsel for the District,

transmitted a letter to Greene and John Cermack, Jr. of BakerHostetler that, among other

things, reiterated the fact that the District had previously terminated BakerHostetler as

counsel for the District and reminded them of the District's request made on August 3,

2017 that BakerHostetler promptly turnover the District's files and electronic records as

required by Rule 3-700 of the Rules of Professional Conduct.  On August 28, Peter James

of BakerHostetler responded to McCormick's August 24 letter and refused to comply with

the District's request based on BakerHostetler's position that Gutierrez was not a member

---

[18] Northcraft Decl. at pp. 9-10, ¶¶ i and j. and Exs. 20 to 23 attached to Dkt. 106.
[19] As the law firm of BakerHostetler firm also represented HCCA, HCCA was represented by both Orrick and BakerHostetler.
[20] Northcraft Decl. at pp. 10-12, ¶¶ k through m. and Exs. 24 to 29 attached to Dkt. 106.

1   of the Board and so the Board could not meet to terminate BakerHostetler.

2            4.      **HCCA Expedites Its Efforts to Obtain Loans Despite the**

3                  **Board's Decision to Rescind Resolution No. 852 at the July 27**

4                  **Special Meeting**

5        While HCCA and those acting on its behalf were (1) hard at work attempting to

6   prevent the District from conducting any Board meetings and unsuccessfully obstructing

7   Gutierrez from being seated as a member of the Board and (2) with the knowledge that

8   the Board had rescinded any authorization HCCA may have had to borrow money in the

9   District's name, HCCA expedited its efforts to obtain loans in the District's name

10   secured by District assets and sell those District assets under a "sale/leaseback"

11   financing arrangement.

12        In or around late July 2017, Germany, acting in his capacity as the CFO/COO of

13   HCCA, began discussions with an entity then called Celtic Leasing Corporation ("Celtic

14   Leasing") to obtain a loan or financing in an amount as high as $20 million. Germany

15   pursued a loan or financing with Celtic Leasing despite his knowledge that on July 27,

16   2017, the District's Board had voted to rescind Resolution No. 851 and Resolution No.

17   852 regarding HCCA's authority to seek such loans on behalf of the District.

18        In fact, on or about July 28, 2017, in pursuit of a loan or financing arrangement,

19   Germany transmitted an email to Timothy Ong of Celtic Leasing which stated: "The

20   critical factor for me is time. I would like to get this funded very quickly. Thank you."

21   HCCA was desperate to close a financing transaction as fast as possible because

22   HCCA believed and understood that: (a) the Board had rescinded Resolution No. 852;

23   and (b) HCCA and Benzeevi's efforts to obstruct Gutierrez from her rightful position on

24   the Board as the duly elected Board member in the recall election would not be

25   successful.

26        Despite the lack of authority to sell any District assets, pledge District assets as

27   collateral for any loan or enter into any other type of agreement for the sale and

28   leaseback of District assets, Benzeevi and Germany orchestrated a transaction with

1  Celtic and MB Financial, a national banking association ("MB Financial") to (a) sell

2  personal property assets of the District to Celtic for the sum of $3,000,000; (b) obligate

3  the District to lease that personal property back from Celtic for the sum of $82,026.00

4  per month; and (c) direct Celtic to wire transfer the $3,000,000 in proceeds from the

5  sale of District assets to the bank account of Tulare Asset Management, which was

6  owned and controlled exclusively by Benzeevi (the "Celtic Transaction").[21]  In

7  connection with the Celtic Transaction, on August 28, 2017, BakerHostetler, acting as

8  "special counsel" to HCCA, provided Celtic with an opinion letter with respect to the sale

9  and leaseback of the District's assets to Celtic.  On August 25, 2017, Michael Allan (the

10 same attorney that represented Kumar and sent a "cease and desist" letter to the Board

11 threatening the Board if it recognized Gutierrez as a duly elected Board member)

12 provided BakerHostetler with an opinion letter respecting Gutierrez's qualifications as a

13 Board member on which the District believes Celtic and MB Financial relied in order to

14 proceed with the Celtic Transaction.

15                  **5.      HCCA Directs the $3,000,000 in Loan Proceeds from the Sale**

16                          **of District Assets to be Wired To The Bank Account of**

17                          **Benzeevi's Company, Tulare Asset Management**

18         HCCA provided Celtic with wire transfer instructions to wire the sum of $3,000,000

19 to the account of Tulare Asset Management, LLC, Attn: Accounts Receivable, which

20 Benzeevi operated out of his residence.  On August 31, 2017 and prior to the wire being

21 sent, Celtic requested that Germany confirm that the address "for the Tulare Asset

22 Management Account" was the same address as the District's Hospital address at 869

23 N. Cherry Street, Tulare, CA 93274.  Germany represented that the address of Tulare

24 Asset Management was the same as the District's address by stating to Celtic in a written

25

26 _____
   [21] The documentation related to this transaction is appended to the exhibits to the complaint in Adversary
   No. 18-01008.  Germany also attempt to obtain a loan of $7 million from Leasing Innovations
27 secured by the District's real and personal property, but was unable to do so before the District filed its
   petition commencing this chapter 9 case.  However, Leasing Innovations placed liens on the District's real
28 and personal property assets in advance of the transaction closing, and the District's counsel was forced
   to spend time and money to remove such liens.

Memorandum of Points and Authorities In Support of Motion     -10-     M:\S-U\TRMC\PLEADINGS\Adversary
Proceedings\TRMC v. HCCA Ad Proc 18-01005\WW-
1 Motion for Declaratory
Judgment\brief.final.070218.kdd.docx

1   communication that "Yes, this is the same address." Germany, however, knew that

2   Tulare Asset Management did not do business at 869 N. Cherry Street, Tulare, CA and

3   was not authorized to use the District's Hospital address in any manner whatsoever. On

4   August 31, 2017, MB Financial wire transferred the $3,000,000 in proceeds from the

5   unauthorized sale of the District's assets into the account of Tulare Asset Management.

6   By on or around September 13, 2017, roughly two weeks after receiving the $3,000,000

7   in proceeds of the unauthorized sale of the District's assets to Celtic, Benzeevi had

8   caused the $3,000,000 to be withdrawn and transferred from the Tulare Asset

9   Management bank account.[22]

10          **6.     HCCA Sued The District in Los Angeles Superior Court And**

11                **Notified the District That It Deemed Itself "Insecure"**

12        Two days after completing the process of transferring the $3,000,000 out of the

13   Tulare Asset Management bank account, HCCA filed a lawsuit in Los Angeles Superior

14   Court on September 15, 2017. The Lawsuit alleges, *inter alia*, that the District owed

15   HCCA the principal amount of $7 million for loans HCCA allegedly advanced to the District

16   for which "HCCA has received promissory notes." That same day, HCCA sent the District

17   a notice stating that it deemed itself "insecure" and demanded that the District provide it

18   with an irrevocable Letter of Credit from a U.S. banking institution acceptable to HCCA

19   ("HCCA Notice"). It was not until on or about September 26, 2017, that HCCA and

20   Benzeevi abandoned their efforts, by and through their attorneys, to unsuccessfully block

21   and prevent Gutierrez from serving on the Board.

22        In late September of 2017 and shortly after Benzeevi (a) absconded with

23   $3,000,000 obtained from selling the District's personal property to Celtic by instructing

24   MB Financial Bank to wire the money into the bank account of Tulare Asset Management

25

26

27

28

---

[22] On October 4, 2017, Benzeevi, acting in his capacity as the manager of Tulare Asset Management, LLC, filed an LLC-12 Statement of Information with the office of the Secretary of State of the State of California changing the street address of Tulare Asset Management, LLC from Benzeevi's residence on Lakewood Drive in Visalia, California, to 869 N. Cherry Street, Tulare, CA (the address of the District's Hospital). However, the LLC-12 Statement of Information filed by Benzeevi did not change the mailing address of Tulare Asset Management, which remained at the address of Benzeevi's residence on Lakewood Drive in Visalia. See, RJN at Ex. H.

thereby depriving the District of critical cash; (b) sued the District in Los Angeles County Superior Court for over $7 million; and (c) notified the District that, among other things, HCCA would shut down operations at the Hospital unless the District obtained prompt funding, Benzeevi then caused a Deed of Trust to be recorded that he executed without any authority that granted his company, HCCA, a lien on the District's real property.[23]

On the same day it recorded the Deed of Trust, HCCA requested in writing that the Board conduct an emergency meeting on Sunday, October 1, 2017 (the "Benzeevi Letter").[24] In the Benzeevi Letter, HCCA stated that the District: (a) had a "CRITICAL liquidity crisis," (b) was "COMPLETELY out of cash," (c) many vendors were threatening to cease providing goods and services, and (d) it lacked "sufficient cash to fund the entire gross payroll.". HCCA also alleged it was owed $7 million and would not extend further credit to the District. HCCA further stated that it had notified the California Department of Public Health ("CDPH") that day of "the District's inability to fund payroll." *Id.* Finally, Benzeevi wrote "[w]ithout immediate approval for the District to obtain prompt funding, the only alternative will be for HCCA to move immediately to cease operations at the Hospital and to consider immediately a plan over the next several days to cease operations at the Hospital."

## 7.   The District Filed Its Chapter 9 Petition to Save the Hospital

Given (a) the District's insolvency and its inability to fund payroll and pay other obligations as and when they became due, (b) HCCA's threat to cease operations at the Hospital and other medical facilities thereby creating a health and safety emergency for

---

[23] The Deed of Trust purports to irrevocably grant, transfer and assign to a trustee in trust, with power of sale, certain public real property commonly known as 1425 East Prosperity Avenue in Tulare, California (the "Evolutions Plaza property"), as more particularly described in the Deed of Trust, for the benefit of HCCA. The Deed of Trust recites that it was made for the purpose of securing payment of ten promissory notes allegedly executed by the District in favor of HCCA over a two year period from July 31, 2015 through July 31, 2017.

[24] Docket No. 115 at pp. 160-61 (emphasis in original). The District believes that Benzeevi, armed with his inside knowledge of the District's dire financial crisis, knew that the District was headed into bankruptcy and wanted the Deed of Trust in order to gain more leverage against the District. The Deed of Trust bears the words "OHSUSA" in the footer which appears to indicate that it is a document prepared by Orrick, Herrington and Sutcliffe, HCCA's counsel. The District disputes the validity of the promissory notes and the amount of any indebtedness to HCCA, but it is not necessary for the Court to decide that dispute at this time because it can be resolved through the ordinary course of the claims adjudication process.

1   patients and the public seeking medical care, and (c) the likelihood that the CDPH might

2   involuntary suspend the District's license, the District filed its petition for chapter 9

3   protection on an emergency basis on September 30, 2017 (the "Petition Date"). Given

4   these dire circumstances and with no ability to obtain adequate funding on an urgent

5   basis, the District temporarily suspended operations effective midnight on October 28,

6   2017 and voluntarily surrendered its license to the CDPH to avoid a forced shut down.

7           **8.      The District Learns of the Deed of Trust and HCCA Refuses To**

8                  **Reconvey the Deed of Trust and The District Files This**

9                  **Adversary Proceeding**

10          After the District learned of the existence of the Deed of Trust in mid October 2017

11  and HCCA failed and refused to reconvey the Deed of Trust despite the District's

12  demands, the District commenced this adversary proceeding.   HCCA does not dispute

13  that the District requested that HCCA cause the Deed of Trust to be reconveyed and that

14  HCCA has not done so.[25] Consequently, the District filed this adversary proceeding on

15  January 23, 2018, and filed a first amended complaint ("Complaint") on May 8, 2018. *See*,

16  Dkt. 27.  HCCA filed its answer to the Complaint on June 4, 2018. *See*, Dkt. 35.  HCCA's

17  actions have deprived the District of a key asset that it could use as security to obtain the

18  funds necessary to reopen the Hospital and provide medical care to the District's

19  residents.

20  **III.   FACTS MATERIAL TO THIS MOTION**

21          As set forth in the Statement of Undisputed Facts, the District submits that the

22  following material facts set forth below are not in dispute.

23          A.      HCCA is managed, owned and controlled by Benzeevi. SSF 1.

24          B.      The District adopted and is governed by its Bylaws. SSF 2.

25          C.      The District and HCCA entered into the MSA on or about May 29, 2014.

26  SSF 3.

27  _____

28  [25] Dkt. 35 at p. 6, lns. 7-9.

Memorandum of Points and Authorities In Support of Motion    -13-          M:\S-U\TRMC\PLEADINGS\Adversary
Proceedings\TRMC v. HCCA Ad Proc 18-01005\WW-
1 Motion for Declaratory
Judgment\brief.final.070218.kdd.docx

D.      Benzeevi signed the document entitled Short Form Deed of Trust and Assignment of Rents ("Deed of Trust") which was recorded in the Official Records of the County of Tulare as Instrument No. 2017-0059339. SSF 4.[26]

E.      Benzeevi was never elected to be a member of the Board of Directors of the District. SSF 5.

G.      Benzeevi was never elected by any Board Members to be an officer of the District. SSF 5.

H.      The District's Board of Directors never appointed Benzeevi as the Chief Executive Officer of the District. SSF 5.

I.      The District never entered into a contract of employment with Benzeevi to serve as the Chief Executive Officer or manager of the District. SSF 5.

## IV.    ARGUMENT

### A.    This Court Has Jurisdiction and Is Authorized To Issue a Declaratory Judgment That The Deed of Trust Is Void and of No Force or Effect.

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 157(d) and 1334. Venue is proper under 28 U.S.C. § 1409.  The sixth claim for a declaratory judgment is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (K) and (O) because it involves matters concerning the administration of the District's property, the adjustment of the debtor-creditor relationship and the validity, extent and priority of a lien. Rule 7001(9) of the Federal Rules of Bankruptcy Procedure provides that an adversary proceeding can be brought to obtain a declaratory judgment to determine the validity, priority, or extent of a lien or other interest in property.  Thus, declaratory relief under 28 U.S.C. § 2201 is authorized and appropriate to determine the issue presented in the District's sixth claim for relief: whether Benzeevi lacked authority to sign the Deed of Trust as the CEO of the District and cause it to be recorded for the benefit of Benzeevi's company, HCCA.

---

[26] Exhibit A to Complaint. The Deed of Trust bears the words "OHSUSA" in the footer which appears to indicate that it is a document prepared by the Orrick firm.

## B.    The Legal Standard for Granting Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), made applicable pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure ("FRBP"), a party is entitled to summary adjudication in its favor if the pleadings together with the affidavits, if any, show that there is no issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56 ("FRCP 56").  Summary judgment is an appropriate tool to secure the just, speedy and inexpensive determination of every action. *Celotex Corp., v. Catrett*, 477 US 317, 322, 106 S. Ct. 2548, 2522 (1986).

FRCP 56 only requires that there be no genuine issue of material fact, not that there be an absolute absence of any factual dispute between the parties. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 247-248, 106 S. Ct 2505, 2509-2510 (1986); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992) (same); *Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 760 (9th Cir. 2008) (same).  A fact is material if the fact may affect the outcome of the case.  *United States v. AMC Entertainment, Inc.*, 232 F. Supp.2d 1092, 1107-1108 (C.D. Cal. 2002), *appeal denied*, 245 F. Supp.2d 1094 (C.D. Cal. 2003).   An issue or dispute about a material fact is genuine only if the evidence is such that the trier of fact could return a verdict for the nonmoving party.  *Hanon*, *supra*, 976 F.2d at 500.  If the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *Hanon*, *supra*, 976 F.2d at 500 (emphasis added).

The party seeking summary judgment bears the initial burden of production on the motion.  *Celotex, supra*, 477 US at 325, 106 S. Ct. at 2548; *Caneva*, *supra*, 550 F.3d at 761 ("The party moving for summary judgment must initially identify 'those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.'") *quoting Celotex, supra*, 477 U.S. at 323.  When the movant meets its burden, the nonmoving party may not rest on allegations or denials in

1   its pleading and must do more than make "conclusory allegations [in] an affidavit." *Lujan*

2   *v. National Wildlife Federation*, 497 US 871, 888, 110 S. Ct. 3177, 3188 (1990). Rather,

3   the nonmovant must respond with evidence setting forth specific facts showing a

4   genuine issue for trial. *Caneva*, *supra*, 550 F.3d at 761. If the nonmovant fails to meet

5   this burden, then the court should enter summary judgment against the nonmovant.

6   Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows

7   that there is no genuine dispute as to any material fact and the movant is entitled to

8   judgment as a matter of law.").

9   ### C.   The District Has Established That The Deed of Trust Is Void Because

10  ### Benzeevi Was Not Authorized To Execute The Deed of Trust

11      California law imposes requirements on the transfer of interests and estates in

12  real property to protect against unauthorized conveyances exactly like the situation

13  presented in this case. "In order to create an enforceable, consensual lien on real

14  property in California, the owner of the parcel must execute either a mortgage or deed

15  of trust to a creditor. Cal. Civ. Code § 2875 (special liens); § 2947 *et seq;* §

16  2898 (priority of mortgage or deed of trust over other liens); Cal. Civ. Proc. Code §§

17  725a, 726 (foreclosure of mortgage or deed of trust); *see also 27 Cal. Jur. 3d Deeds of*

18  *Trust*  [*18] §§ 4, 28. Without such an instrument, no lien on the real property is legally

19  valid. CAL. CIV. CODE §§ 1091, 2922; see also 27 *Cal. Jur. 3d, supra*, § 33."

20  *Marinovich v. Sanders (In re Marinovich)*, 2007 Bankr. LEXIS 4137 *17-18 (D. Ariz.

21  Bankr. 2007).[27]  California Civil Code § 1091 provides that "An estate in real property,

22  other than an estate at will or for a term not exceeding one year, can be transferred only

23  by operation of law, or by an instrument in writing, subscribed by the party disposing of

24  the same, or by his agent thereunto authorized by writing." Cal. Civil .Code Code §

25  1091. For the reasons set forth below, the District is entitled to a declaratory judgment

26  that the Deed of Trust is void and of no force or effect because Benzeevi was not the

27

28

---

[27] A deed of trust is a conveyance of an interest in real property. *Hahn v. Hahn*, 123 Cal. App. 2d 97 (1954)(A deed of trust is a grant of an interest in real property).

Chief Executive Officer of the District, and was not authorized to execute the Deed of Trust as the Chief Executive Officer of the District or in any other capacity on behalf of the District.

**1. The District's Bylaws Provide that Officers of the District Must Be Members of the Board and the President of the Board Is The Only Officer Authorized To Execute Conveyances and Instruments**

The District is governed by the "Tulare Local Healthcare District Bylaws" adopted on May 22, 2013 (the "Bylaws") and the Local Hospital District Law. The Bylaws expressly state the requirements to be an officer of the District. Article IV, Section 1 provides that:

"The officers of the District shall be members of the Board of Directors and elected by the Board members. The officers of the District shall include a President, Vice-President, Secretary and Treasurer and such other officers as may be designated by the Board of Directors at the first regular meeting following an even numbered election year, and as further described in Article III, Sec. 4 of the Bylaws." Ex. A to RJN.

Benzeevi was never a member of the Board of Directors and, therefore, was never an officer of the District. SSF 6. Further, Benzeevi was never elected by any Board Members to be an officer of the District. SSF 7.

The District's Bylaws also specify the powers conferred upon each of the officers of the District identified in Article IV, Section 1. The duties and responsibilities of the officers of the District are enumerated in sections 2 through 5 of Article IV of the Bylaws. The District's Bylaws expressly state that the President is the only officer of the District authorized to "sign, as President, such contracts, conveyances and other instruments in writing as the Board of Directors shall authorize or direct the President to sign." Ex. A to RJN at Section 2(c), Article VI. Therefore, contracts, conveyances and other instruments can only be made after the Board of Directors authorizes and directs the President to sign such documents. This provision of the Bylaws exists to prevent

the exact scenario now facing the District -- title to public property, the Evolutions Plaza owned by the District, was conveyed to a third party without authorization or the knowledge of the District's Board for the benefit of HCCA.  For this reason alone, the Deed of Trust is void.

**2.      Benzeevi Was Not The Chief Executive Officer of the District or Authorized By Any Writing To Execute The Deed of Trust As The District's Agent**

The District's Bylaws do contain provisions respecting the appointment of a Chief Executive Officer and manager of the District "as provided and in compliance with The Local Health Care Law and Ralph M. Brown Act."  Article VI of the Bylaws entitled "Chief Executive Officer,"  provides:

> "The Board shall appoint and may enter into a contract of employment with a competent experienced Administrator who shall serve as the Chief Executive Officer (CEO) and manager of the District, as provided and incompliance with The Local Health Care Law and Ralph M. Brown Act." RJN, Ex. A at Article VI.

Article VI, section 1b states that "[t]he Board shall be solely responsible for the appointment or dismissal of the CEO."  The District never appointed Benzeevi as the Chief Executive Officer of the District and never entered into a contract of employment with Benzeevi to serve as the Chief Executive Officer or manager of the District. SSF 8 and 9.  Finally, section 2 of Article VI lists the "Authorities and Duties" of the CEO and none of the enumerated "authorities and duties" authorize any CEO of the District to convey an interest in the District's real property (which is public property). RJN, Ex. A.

Instead, the District and HCCA entered into the Management Services Agreement ("MSA") and engaged HCCA to be the manager of the Hospital located at 869 N. Cherry Street in Tulare, California.  Under the MSA, HCCA was the Manager of the Hospital. Ex. 2 to Dkt. 89 at pp. 36 and 39 (¶ 1(kk))  Pursuant to paragraph 4 of the MSA entitled "Duties of Manager" and subparagraph (a) entitled "Hospital Chief Executive Officer," HCCA was required to provide a "Chief Executive Officer" for the

1    Hospital to "provide routine, day-to-day administrative and management services for the

2    Hospital and the Clinics and Other Facilities..." and to "carry out the usual and

3    customary duties of such positions within the health care industry." Ex. 2 to Dkt. 89 at

4    pp. 44-45 (¶ 4(a)(i)).  The MSA defined the term "Hospital" as "the acute care hospital at

5    869 North Cherry Street in Tulare, California." Ex. 2 to Dkt. 89 at p. 36.  Paragraph

6    4(a)(i) of the MSA further provided that the Hospital chief executive officer "shall be an

7    employee of Manager." Ex. 2 to Dkt. 89 at p. 44 (¶ 4(a)(i)).  It also provided that the

8    Hospital chief executive officer's authority "shall be at least as extensive as the authority

9    of the District delegated to the District's former chief executive officer (at the end of

10   2013), together with such additional authority as provided in the District's Bylaws." *Id.*

11   Nothing in paragraph 4(a) provided any Chief Executive Officer of the Hospital, who was

12   an employee of HCCA (not a Board Member or officer of the District) pursuant to the

13   terms of the MSA, with the authority to execute the Deed of Trust.[28]

14          Moreover, paragraphs 4(j)(i)(2) and 4(j)(i)(3) of the MSA which are contained in

15   the section entitled "Pledge of Credit" did not authorize Benzeevi to claim to be the

16   District's CEO or authorize him to execute the Deed of Trust and cause it to be

17   recorded.  Paragraph 4(j)(i), of which (2) and (3) are subparts, provides that "Manager

18   shall not engage in any financial lending, financing or banking actions that result in

19   liens, mortgages, lines of credit, security interest or financial obligations in the name of

20   the District without the prior written consent of the Governing Body." Ex. 2 to Dkt. 89 at

21   p. 53 (¶ 4(j)(i)). The MSA defined the term "Governing Body" as the Board of Directors

22   of the District. Ex. 2 to Dkt. 89 at pp. 38 and 40. Paragraph 4(j)(i)(1) stated that HCCA

23   had the right, but not the obligation, to advance funds if certain conditions were met. Ex.

24   2 to Dkt. 89 at p. 53 (¶ 4(j)(i)). Paragraph 4(j)(i)(2) provided that "[t]o the extent Manager

---

[28] Furthermore, even if a Chief Executive Officer of the District (as opposed to the Hospital) had been
appointed or a contract of employment had been entered into, the District Bylaws still do not authorize
any Chief Executive Officer to execute a conveyance of real property.  Section 1 of Article VI provides
that the CEO shall act as the "duly authorized representative" of the Board of Directors in all matters the
Board has not otherwise formally designated to another."  The Bylaws formally designate to the President
of the District the power to sign, as President, such contracts, conveyances and other instruments in
writing as the Board of Directors shall authorize or direct the President to sign."

Memorandum of Points and Authorities In Support of Motion          -19-          M:\S-U\TRMC\PLEADINGS\Adversary
Proceedings\TRMC v. HCCA Ad Proc 18-01005\WW-
1 Motion for Declaratory
Judgment\brief.final.070218.kdd.docx

advances funds, this Agreement constitutes a security agreement pursuant to which the District provides Manager with a lien on all of the District's assets, to the extent allowed by Law, and Manager shall have the right to file a Uniform Commercial Code financing statement with respect to such obligation without the signature of the District." Ex. 2 to Dkt. 89 at p. 53 (¶ 4(j)(i)(2)). Paragraph 4(j)(i)(2) concerns only a security agreement in assets which can be perfected by the filing of a Uniform Commercial Code financing statement, not a conveyance of real property via a written instrument such as the Deed of Trust. Nothing in paragraph 4(j)(i)(2) authorized Benzeevi to execute the Deed of Trust and cause it to be recorded.

Paragraph 4(j)(i)(3) provides, in part, that "[t]he District hereby irrevocably appoints Manager as its attorney-in-fact coupled with an interest with full power to prepare and execute any documents, instruments and agreements, including but not limited to, any note evidencing the advance or loan and any Uniform Commercial Code financing statements, continuation statements and other security instruments as may be appropriate to perfect and continue its security interest in favor of Manager." Ex. 2 to Dkt. 89 at p. 53 (¶ 4(j)(i)(3)). Again, nothing in paragraph 4(j)(i)(3) authorized Benzeevi to execute the Deed of Trust and cause it to be recorded. Rather, at best, when read in the context of paragraph 4(j)(i) and 4(j)(i)(2), paragraph 4(j)(i)(3) only authorized HCCA to act as an attorney-in-fact to prepare and execute documents as may be appropriate to perfect and continue an existing security interest in assets which can be perfected by the filing of a Uniform Commercial Code financing statement, not create a security interest by executing the Deed of Trust conveying title to the District's real property to a third party. Moreover, HCCA did not execute the Deed of Trust under paragraph 4(j)(i)(2) or 4(j)(i)(3) as an "attorney-in-fact." Instead, the Deed of Trust reflects that Benzeevi executed it without authority by falsely asserting that he was the CEO of the District.

While the MSA may create the right to file a UCC-1, it does not create a security agreement sufficient to record the Deed of Trust and create a lien on the Evolutions

Plaza property.  The only credible meaning of the "Pledge of Credit" provision in the MSA is that it may create a right for HCCA to file a UCC financing statement.  However, as the MSA fails to adequately describe any collateral, it is not an enforceable security agreement.  As such, the MSA did not give HCCA the right to record the Deed of Trust and encumber the Evolutions Plaza property.

In order to create an enforceable security agreement, the agreement must contain a sufficient description of the collateral. *Secured Transactions in California Commercial Law Practice*, § 2.6, pg. 2-6 (CEB 2018); *Pacific States Sav. & Loan Co. v. Hoffman*, 134 Cal.App. 604, 606 (1933). This common law requirement was incorporated into the California Commercial Code by § 9203(b)(3)(A), which provides that "a security interest is enforceable against the debtor and third parties with respect to the collateral only if each of the following conditions is satisfied … [t]he debtor has authenticated a security agreement that provides a description of the collateral."
Generally, "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described." That said, the "prevailing case law" has adopted the view that that a description of collateral in a security agreement that describes "all assets" or "all personal property" is "not sufficient" to create a security interest therein. *See* Assembly Committee Comment 2 and UCC Committee Comment 2 to California Commercial Code § 9108.

As is critical to this issue, the UCC and the California Commercial Code follow this "prevailing view," and state that a <u>description of collateral as 'all the debtor's assets' or 'all the debtor's personal property' or using words of similar import does not reasonably identify the collateral.</u>" Id. at § 9108(c) (emphasis added). As such, a security agreement that purports to describe "all the debtor's assets" as collateral is not enforceable. Cal. Commercial Code sec. § 9108.  On the other hand, unlike a security agreement, a "financing statement sufficiently indicates the collateral that it covers if the financing statement provides … an indication that the financing statement covers all assets or all personal property." Cal. Commercial Code § 9504(2).

1　　　　These principals were applied in the case of *In Re McGrath,* 2008 WL 859152

2　(Bankr. E.D. Cal. 2008). In that case, the security agreement at issue specified that all of

3　the maker's "currently existing and after acquired assets and property … and their

4　proceeds" would secure a note. *Id.* at *10. In finding that this language was not sufficient

5　to create a security interest, Judge McManus concluded that the "putative collateral is too

6　broad. It essentially says all property of the Pinochle Farms will secure" the note *Id.* at

7　*11. As such, the Court held that the language was "not sufficient in a security agreement."

8　*Id.* However, the court also noted that the "[s]uch phrasing may be sufficient for a financing

9　statement." *Id.*

10　　　　The same is true in this case. The MSA states that, to the extent HCCA advances

11　funds to TRMC, this agreement constitutes a security agreement pursuant to which

12　TRMC provides HCCA a "lien on all of the District's assets, to the extent allowed by Law,

13　and [HCCA] shall have the right to file a Uniform Commercial Code financing statement

14　with respect to such obligation without the signature of the District." MSA, para. 4(j)(2)

15　(emphasis added). However, because the MSA describes "all of the District's assets" as

16　collateral, it is not sufficient to constitute a security agreement. Cal. Commercial Code §

17　9108(c); *In Re McGrath*, 2008 WL 859152 at *11. On the other hand, this description of

18　collateral is sufficient for a UCC financing statement. Cal. Commercial Code § 9504(2).

19　Thus, at most, the "Pledge of Credit" provision in the MSA gave HCCA the right to file a

20　UCC financing statement. It did not, however, create a security agreement whereby

21　HCCA could record a lien against TRMC's real property, such as Evolutions. Indeed, the

22　"Pledge of Credit" provision specifically states that, with respect to any obligation created

23　thereunder, HCCA "shall have the right to file a Uniform Commercial Code financing

24　statement." MSA, ¶4(j)(i)(2).

25　///

26　///

27　///

28　///

1  **V.  CONCLUSION**

2       For the foregoing reasons, the District respectfully requests that the motion be

3  granted and that the Court enter a judgment determining that: (a) Benzeevi did not have

4  the authority to execute the Deed of Trust and cause it to be recorded; and (b) the Deed

5  of Trust is void and of no force or effect.

6  Dated: July 2, 2018            WALTER WILHELM LAW GROUP,

7                               a Professional Corporation

8               By:

9                              Riley C. Walter,

10                              Attorneys for Plaintiff Tulare Local Healthcare
                                     District

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28